# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) TIFFANY SIMPSON, Personal Representative of the Estate of Logan Wayne Simpson, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 18-cv-491-GKF-FHM |
| (1) JON LITTLE,<br>(2) IKE SHIRLEY,<br>(3) CITY OF BIXBY, OKLAHOMA,<br>(4) JANE DOE, and<br>(5) JOHN DOE, | ) ) ) ) ) ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS CITY OF BIXBY AND IKE SHIRLEY'S MOTION FOR SUMMARY JUDGMENT

---

William B. Federman, Okla. Bar No. 2853
Carin L. Marcussen, Okla. Bar No. 19869
Federman & Sherwood
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com
clm@federmanlaw.com

Kevin D. Adams, Okla. Bar No. 18914
Attorney at Law
417 W. 7th St., Ste. 202
Tulsa, OK 74119
Telephone: (918) 582-1313
Facsimile: (918) 512-4206
kadams@lawyer.com

Attorneys for Plaintiff

---

October 2, 2020

---

## TABLE OF CONTENTS

I.      INTRODUCTION      1

II.     PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
        "UNCONTROVERTED" FACTS.................................................................................... 1

III.    PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS THAT
        PRECLUDE SUMMARY JUDGMENT...................................................................... 12

IV.     ARGUMENT AND AUTHORITIES ............................................................................ 15

        A.      STANDARD OF REVIEW ................................................................................ 15

        B.      THE UNDERLYING CONSTITUTIONAL VIOLATIONS ............................. 16

                1.      The Shooting ........................................................................................ 16

                2.      Delaying Medical Care ....................................................................... 17

        C.      PLAINTIFF'S § 1983 HIRING CLAIM ............................................................ 19

        D.      PLAINTIFF'S § 1983 FAILURE TO TRAIN CLAMS ..................................... 23

                1.      Use of Deadly Force ........................................................................... 23

                2.      Delay of Medical Care ........................................................................ 28

        E.      SHIRLEY IS NOT ENTITLED TO QUALIFIED IMMUNITY ........................ 30

V.      CONCLUSION.............................................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) ................................................................................... 15

*Alder v. Wal-Mart Stores, Inc.*,
  144 F.3d 664 (10th Cir. 1988) ................................................................. 15

*Allen v. Muskogee*,
  119 F.3d 837 (10th Cir. 1997) ................................................................. 27

*Barney v. Pulsipher*,
  143 F.3d 1299 (10th Cir. 1998) ............................................................... 21

*Board of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*,
  520 U.S. 397 (1997) ......................................................... 19, 20, 21, 25, 27

*Brown v. Gray*,
  227 F.3d 1278 (10th Cir. 2000) ......................................................... 23, 27

*Burke v. Glanz*,
  292 F. Supp. 3d 1235 (N.D. Okla. 2017) ........................................... 17, 18

*Celotex v. Catrett*,
  477 U.S. 317 (1986) ................................................................................. 15

*City of Canton, Ohio v. Harris*,
  489 U.S. 378 (1989) ............................................................. 23, 24, 25, 27

*City of Revere v. Massachusetts General Hosp.*,
  463 U.S. 239 (1983) ................................................................................. 17

*Cordova v. Aragon*,
  569 F.3d 1183 (10th Cir. 2009) ............................................................... 17

*DeSpain v. Uphoff*,
  264 F.3d 965 (10th Cir. 2001) ................................................................. 29

*Estate of Booker v. Gomez*,
  745 F.3d 408 (10th Cir. 2014) ........................................................... 18, 19

*Estelle v. Gamble*,
  429 U.S. 97 (1976) ................................................................................... 28

ii

*Farmer v. Brennan*,
  511 U.S. 825, (1994)..................................................................................... 28

*Godawa v. Byrd*,
  798 F.3d 457 (6th Cir. 2015) ................................................................. 26, 27

*Graham v. Connor*,
  490 U.S. 386 (1989)................................................................................ 16, 17

*Haynes v. Level 3 Comm's LLC*,
  456 F.3d 1215 (10th Cir. 2006) ...................................................................... 15

*Holland ex rel. Overdorff v. Harrington*,
  268 F.3d 1179 (10th Cir. 2001) ...................................................................... 16

*Hunt v. Uphoff*,
  199 F.3d 1220 (10th Cir. 1999) ...................................................................... 28

*J.L.C. v. McKinney*,
  2014 WL 4145550 (W.D. Okla. Aug. 19, 2014) ........................................ 21

*Jones v. Hacker*,
  No. 13-CV-00444-JHP, 2015 WL 1279363 (Mar. 20, 2015)....................... 24

*Krein v. Price*,
  596 F. App'x 184 (4th Cir. 2014) ................................................................. 26

*Lytle v. Bexar County*,
  560 F.3d 404 (5th Cir. 2009) ........................................................................ 26

*Mata v. Saiz*,
  427 F.3d 745 (10th Cir. 2005) ................................................................. 18, 19

*McGrath v. Tavares*,
  757 F.3d 20 (1st Cir. 2014).......................................................................... 26

*Olsen v. Layton Hills Mall*,
  312 F.3d 1304 (10th Cir. 2002) ...................................................................... 18

*Otey v. Marshall*,
  121 F.3d 1150 (8th Cir.1997) ........................................................................ 27

*Raby v. Baptist Med. Ctr.*,
  21 F. Supp. 2d 1341 (M.D. Ala. 1998) .................................................... 21, 22

*Ramos v. Lamm*,
  639 F.2d 559 (10th Cir. 1980) ...................................................................... 28

*Reavis v. Frost,*
   967 F.3d 978 (10th Cir. 2020) ................................................................... 17, 26

*Rollins v. Town of Haskell, Okla.,*
   No. CIV 08-309-JHP, 2009 WL 3614784 (Oct. 28, 2009) ................................ 24, 25

*Saucier v. Katz,*
   533 U.S. 194 (2001) ...................................................................................... 17

*Scott v. United States,*
   436 U.S. 128 (1978) ...................................................................................... 17

*Sealock v. Colorado,*
   218 F.3d 1205 (10th Cir. 2000) ..................................................................... 28

*Tennessee v. Garner,*
   471 U.S. 1 (1985) ......................................................................................... 16

*Tolan v. Cotton,*
   572 U.S. 650 (2014) ...................................................................................... 16

*Valderrama v. Rousseau,*
   780 F.3d 1108 (11th Cir. 2015) .................................................................. 19, 29

*Zuchel v. City & Cty. of Denver, Colo.,*
   997 F.2d 730 (10th Cir. 1993) ................................................................... 25, 26

**Statutes**

70 O.S. § 3311(B)(2) ......................................................................................... 23

70 O.S.§ 3311 ................................................................................................. 24

Plaintiff Tiffany Simpson, Personal Representative of the Estate of Logan Wayne Simpson ("Plaintiff") submits this response in opposition to Defendants City of Bixby and Ike Shirley's Motion for Summary Judgment, Doc. 70, (the "Motion" or "Doc. 70"). The Motion should be denied for the reasons set forth herein.

## I.     INTRODUCTION

Defendant Jon Little ("Little") was repeatedly written up at his previous law enforcement job and, ultimately, was fired for cause. He applied to over a dozen police departments and law enforcement agencies, but no one would hire him – except Defendant City of Bixby ("Bixby" or the "City") and Defendant Ike Shirley ("Shirley" or the "Chief"). Little had a known history of poor decision-making, violating departmental policy, and engaging in unsafe behavior to apprehend a suspect he was pursuing at any cost. Yet, the City and Shirley took no action to discipline or re-train him. Shooting an unarmed sixteen-year-old, Logan Simpson, was the unfortunate, predictable result. Then, as Simpson bled from the gunshot wounds, Bixby's dispatcher, Leslie Aryn Damer, withheld the assistance that was requested to transport Simpson to the hospital. For the facts of the underlying events see *Plaintiff's Response in Opposition to Defendant Jon Little's Motion for Summary Judgment*, Doc. 96, which is incorporated herein by reference. The City and Shirley should be held accountable for their deliberate indifference to the constitutional violations that were likely to and did occur as a result of their flawed hiring decisions and failure to train.

## II.    PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF "UNCONTROVERTED" FACTS[1]

1.  Admitted, in part. Disputed, in part. Plaintiff admits that Little is/was certified by

---

[1] Plaintiff's responses will be cited as "RUF" followed by the paragraph number.

Council in Law Enforcement Education and Training ("CLEET"). Plaintiff disputes that merely by being CLEET certified means Little was adequately trained on the proper use of force. "Specifically, there is no evidence of 'shoot-don't-shoot' scenario training." (*Expert Report of Michael D. Lyman, Ph.D.*, dated 06/18/2020, attached as Exhibit 1, pp. 22-23. *See also Deposition of Michael Lyman*, taken 07/27/2020, attached as Exhibit 2, pp. 124:20 – 127:25; *Individual Full Profile of Jon W. Little*, dated 01/15/2019, attached as Exhibit 3). Even if Little had undergone such training *before* he was hired by the City and the Chief, that would not be adequate. Use of force is a "perishable skill" and "officers require updated, consistent training in use of force options and techniques." (*Lyman Report*, Ex. 1 at pp. 22-23; *Lyman Depo.*, Ex. 2 at pp. 124:20 – 127:25. *See also Deposition of Ike Shirley*, taken 07/01/2020, attached as Exhibit 4, pp. 78:21 – 79:3, 136:21 – 137:13). This is *not* the same as qualifying at the shooting range and is necessary for officers to make "reasonable critical decisions in the field." (*Lyman Report*, Ex. 1 at pp. 22-23; *Lyman Depo.*, Ex. 2 at pp. 124:20 – 127:25. *See also Shirley Depo.*, Ex. 4 at pp. 79:4-10). The City did not require officers, including Little, to take shoot-don't-shoot scenario-based training and there is no evidence that Little had such training. (*Profile*, Ex. 3; *Shirley Depo.*, Ex. 4 at pp. 76:2 – 81:10, 102:8 – 105:24; *Subpoena to Produce Documents to City of Bixby* and *Response* thereto, attached as Exhibits 5-A and 5-B, respectively, at #5).

2.  Admitted, in part. Disputed, in part. Plaintiff disputes that the hiring process utilized by the City and the Chief is adequate for ensuring that the police officers they hire are qualified and possess the right temperament for the job. Plaintiff disputes that the City and the Chief thoroughly and adequately screened Little before hiring him. (*See* Response to Fact No. 3, *infra*).

3.  Disputed. There were numerous red flags that should have kept the City and the Chief from hiring Little. Little lied on his application to the Bixby Police Department ("BPD"). Little

did not disclose that he had been fired from his previous law enforcement job with the Wagoner County Sheriff's Office ("WCSO"). Little said he was "laid off," (*Bixby PD Application*, attached as Exhibit 6, at BPD 0291, 295), but he was fired after "multiple reprimands, violations of the Sheriff Office's rules and procedures, including illegally hacking into a computer to access programs he was not authorized to access." (*Employer's Notice of Employee Termination*, attached as Exhibit 7; *Affidavit of Gary Handley*, attached as Exhibit 8). A candidate who lies on their application is not qualified and should not be hired, (*Shirley Depo.*, Ex. 4 at pp. 16:24 – 17:24), and a law enforcement officer who was fired from one law enforcement agency may be unfit for rehire by another law enforcement agency. (*Id.* at p. 92:3-9). Despite this, Bixby/Shirley made no effort to ascertain whether Little had been fired from WCSO or why. (*Shirley Depo.*, Ex. 4 at pp. 14:12 – 16:23, 92:10 – 93:17, 136:4-20). A BPD investigator contacted WCSO about Little and was told that "[with a] release [BPD] can look [at the] File." (*See Shirley Depo.*, Ex. 4 at pp. 7:21 – 8:6; *Background Investigation of Jon Little*, attached as Exhibit 9 at BPD 0334). Bixby had a release signed by Little, (*see, e.g., Investigative File*, Ex. 9 at BPD 0426; *Little Depo.*, Ex. 15 at p. 47:10-20), but did not send it to WCSO to obtain the file on Little[2], (*Deposition of Lesley Young*, taken 01/29/2020, attached as Exhibit 10, p. 58:2-16; *Deposition of Jeffrey Halfacre*, taken 02/27/2020, attached as Exhibit 11, p. 35:22-25; *Deposition of Dustin Dorr*, taken 02/20/2020, attached as Exhibit 12 at p. 30:7-13). Had Bixby/Shirley obtained WCSO's file on Little, they would have learned:

        a.   Little did not disclose (i.e., he lied) on the application to WCSO[3] that he had

---

[2] In contrast, Bixby sent a release to the Tulsa County Sheriff's Office ("TCSO") to obtain their file on Little. (*See, e.g., Fax from BPD to TCSO*, sent 06/17/2013, attached as Exhibit 13; *Deposition of Josh Turley*, taken 01/30/2020, attached as Exhibit 14, pp. 57:9 – 61:16).

been charged with eluding a police officer in response to a question about prior arrests/convictions on a question about prior legal actions. (*Deposition of Jon Little*, taken 02/20/2020, attached as Exhibit 15 at p. 31:14-20, 32:9 – 33:21; *Personal History*, attached as Exhibit 16, at TULSA 000103; *WCSO Application*, attached as Exhibit 17, at WAGONER 000050 – 51).

b.   Little failed to report a motor vehicle accident and, when confronted, claimed little knowledge. (*Major Handley Memo re: Failure to Report an Accident*, attached as Exhibit 18).

c.   Little illegally hacked a County computer. (*Handley Aff.*, Ex. 8; *Major Handley Memo re: Computer Hacking*, attached as Exhibit 19). Little, of course, denies he did anything wrong. (*Little Depo.*, Ex. 15 at p. 62:13-25).

d.   Little violated Department procedures by failing to turn in found property (tools) into evidence but would not admit that he did anything wrong. (*Major Handley Memo re: Failure to Follow Procedure*, attached as Exhibit 20).

e.   Little would not listen to his training officer(s) and ignored suggestions about how to handle various situations he might encounter as a law enforcement officer, including tactics that he might use in different "felony stop" situations. (*Officer's Narrative* attached as Exhibit 21. *See also Halfacre Depo.*, Ex. 11 at pp. 28:5 – 30:10, 32:17 – 34:20. *See also Letter from Captain Carver*, dated 02/19/2010, attached as Exhibit 22; *Officer's Narrative*, attached as Exhibit 23).

f.   A citizen complained about Little's conduct and attitude. (*Officer's Narrative* attached as Exhibit 24).

g.   The issues at WCSO presented a "concern with [Little's] professionalism."

4

(*Young Depo.*, Ex. 10 at pp. 87:3 – 88:9).

Bixby did obtain Little's file from TCSO, (*see* footnote 1), which also raised concerns about Little's fitness for law enforcement:

> h.   While at the Academy Little and his roommate violated CLEET rules prohibiting cadets from having live ammunition, alcohol, and members of the opposite sex in their room. (*Unacceptable Performance Notice* attached as Exhibit 25). Little, as usual, denied any wrong. (*Id.*)
>
> i.   Little repeatedly wanted to go on patrol and to get out of jail work but TCSO rejected his requests to do so. (*See, e.g., Employee Request Forms*, attached as Exhibit 26; *Personal Development Action Plan*, attached as Exhibit 27; *Employee Exit Interview*, attached as Exhibit 28).

Shirley also testified it is important to know if a candidate had been suspended from school for rule violations including having a weapon in school. (*Shirley Depo.*, Ex. 4 at pp. 16:24 – 17:24, 21:20 – 22:2). Little was suspended from school for having a knife and fighting (*BPD App.*, Ex. 6 at BPD 0287) and made inconsistent statements about the times and reasons he was suspended from high school. (*Compare id. with Little Depo.*, Ex. 15 at p. 16:4-25; *TCSO App.*, Ex. 16 at TULSA 000088). Shirley testified that he would not hire a candidate who had experimented with illegal drugs. (*Shirley Depo.*, Ex. 4 at pp. 17:8 – 18:5). Yet, the BPD application did not ask about past or current drug use. (*See BPD App.*, Ex. 6). Nevertheless, BPD had access to TCSO's file which shows that Little had "experimented" with marijuana, an illegal drug at the time. (*Little Depo.*, Ex. 15 at p. 12:1-9, 13:14-14:4; *TCSO App.*, Ex. 16, at TULSA 000101). Little had been unemployed for approximately five (5) months before he was hired by Bixby/Shirley. He applied to over a dozen police departments or law enforcement agencies and was rejected by each of them.

(*BPD App.*, Ex. 6 at BPD 0297 – 298; *Little Depo.*, Ex. 15 at pp. 47:21 – 53:1). Notably, Little

applied to the police department in his hometown of Owasso, but he failed the oral boards and was

rejected. (*Little Depo.*, Ex. 15 at pp. 14:5-8, 47:21-23; *Letter from Michele Dempster*, dated

04/20/2020, with attachments, attached as Exhibit 29). The psychological evaluation of Little

found that Little "shows a pattern of placing blame on others [and] not accepting responsibility."

(*Interviewer's Report* attached as Exhibit 30).

   4.   Admitted, in part. Disputed, in part. Plaintiff admits that there are no reports of Little

*using* deadly force against a person prior to killing Simpson. However, prior to the Simpson killing

Little had brandished his weapon and *threatened* to use deadly force against another minor. (*See*

*Use of Force Forms*, attached as Exhibit 31 at BIXBY 000052). Little *did* use deadly force against

an animal prior to killing Simpson. (*Id.* at BIXBY 00053). In addition, prior to killing Simpson,

Little had twice used non-deadly force (taser) against a person. (*Id.* at BIXBY 000051, 54). The

fact there are not more reports about Little using force and/or firing his weapon is not surprising.

Little and his supervisor did not prepare the required reports relating to this incident until

specifically instructed to do so by the shooting review board. (*Id.* at BIXBY 000051 (reported

dated 11/10/2018); *Letter from Asst. Chief Choate*, dated 11/05/2018, attached as Exhibit 32 at

BPD 1169). Bixby does not call a board every time a shot is fired – only when someone is injured

or killed. (*Bixby Police Department Policy and Procedures Manual*, dated 02/20/2018, attached

as Exhibit 33, at BPD 0069). If Little/Bixby did not complete a Use of Force Form ("UOF") for

killing someone, there is every reason to believe they did not complete UOF for other occasions

too and with no review board to convene, the failure could go unnoticed and uncorrected. Although

the City has produced no complaints against Little for use of force pre-dating this shooting, there

were certainly *other* complaints made against Little that indicate he did not respect the rights and

dignity of citizens. (*See, e.g., Handley Narrative*, Ex. 24; *Discipline Report*, dated 11/14/2015, attached as Exhibit 34). The City and Shirley do not make it easy or convenient for citizens to make complaints about police officers and, in fact, discourage it. (*Formal Personnel Complaint Form* attached as Exhibit 35).

5.   Disputed. There are two occasions, prior to him killing Simpson, where it is documented that Little engaged in a pursuit that created danger for himself, the suspect, and the public. On January 25, 2015, Little initiated a pursuit and failed to (i) provide accurate information about his location, (ii) keep a safe distance, (iii) wait for back up, (iv) use his siren, or (v) initiate a felony stop. (*Oral Counseling Report*, 02/04/2015, attached as Exhibit 36). On November 1, 2016, Little caused a collision while pursuing a suspect because he was following too closely yet the Pursuit Review Board found the collision to be "unavoidable." (*Discipline Report*, dated 12/06/2016, attached as Exhibit 37). This behavior demonstrates that Little did "whatever it takes" to apprehend a suspect. Also before he killed Simpson, Little pulled his gun and threatened to use deadly force against another minor who was refusing to exit a vehicle with no evidence or claim that the minor was armed or posed a threat to Little or anyone else (the minor was in the passenger seat so he could not have been accused, as Little accuses Simpson, of using the vehicle as a weapon). (*See UOF*, Ex. 31 at BIXBY 000052). This history, particularly when combined with the lack of shoot-don't-shoot scenario training (*see* Response to Fact No. 1, *supra*), made it highly likely that Little would unlawfully use deadly force against a suspect.

6.   Disputed. (*See* Response to Fact No. 1, *supra*).

7.   Admitted, in part. Disputed, in part. Plaintiff admits that Defendants have set forth a portion of their written use of force policy. Plaintiff denies that Little followed the BPD use of force policy because there was not an imminent threat of serious bodily injury to Little or anyone

else when Little shot Simpson. Little did not identify himself as a law enforcement officer or warn Simpson that he would use deadly force if Simpson did not comply with his demands. (*See* Doc. 96).

8-9.    Admitted, in part. Disputed, in part. Plaintiff admits that Defendants set forth the training that dispatchers are *supposed* to receive. Plaintiff disputes any assertion, implication, or suggestion that said training is adequate, was followed or that being certified by the Oklahoma Law Enforcement Telecommunications System ("OLETS") means that a dispatcher is adequately trained. Plaintiff disputes Damer, the dispatcher on duty on July 22, 2018 when Tiffany Simpson called 911, was adequately trained to handle the situation that unfolded that morning. (*See, e.g.,* Response to Fact No. 15, *infra*).

10. Admitted, in part. Disputed, in part. Plaintiff admits that Damer was the dispatcher on duty on July 22, 2018 when Tiffany Simpson called 911. (*Defendant City of Bixby's Supplemental Responses to Plaintiff's Interrogatories*, dated 09/18/2020, attached as Exhibit 38, Response and Supplemental Response to Interrogatory No. 5). However, another dispatcher, Justin Damme, came on duty about the time Simpson was (finally) transported to the hospital and was on duty while the scenes were being secured and while Deante Strickland was booked into jail. (*Id.*; *Incident Detail Report (17464 S. 92nd E. Ave.)*, attached as Exhibit 39; *Supplemental Report by Cameron Mann*, dated 07/25/2018, attached as Exhibit 40).

11-16.  Plaintiff objects and disputes Fact Nos. 11-16. Defendants' rendition of the events of July 22, 2018 does not include *when* each supposed communication between Damer, EMSA, BPD, and the Bixby Fire Department ("BFD") took place. Suspiciously, there is no recording of radio transmissions on July 22, 2018 to confirm what information was received/relayed by whom, to whom, or when that information was received/relayed, even though the City's written policy

states that such recording should be kept for four (4) years. (*BPD Manual*, Ex. 33 at BPD 0093). The City and Shirley *claim* the recorder was not working but they did not realize that until after the shooting. (*See Shirley Depo.*, Ex. 4 at 129:19 – 130:15; *Subpoena Response*, Ex. 5-B). Subject to this general objection and dispute, Plaintiff responds to each fact as follows:

11. Disputed. Tiffany Simpson made two 911 calls on July 22, 2018. (*Audio Recording of First 911 Call*, attached as Exhibit 41; *Audio Recording of Second 911 Call*, attached as Exhibit 42; *911 Call Transcript*, Exhibit 43). The first call was made at 05:09:54; the second at 05:12:38. (*First 911 Call*, Ex. 41; *Second 911 Call*, Ex. 42). The first call lasted 2 minutes, 42 seconds. (*First 911 Call*, Ex. 41). Mrs. Simpson requested the police and an ambulance at her home (16409 South 84th East Avenue, Bixby, Oklahoma) because Deante Strickland had attacked her son with an axe. (*Id.* at 0:45. *See also Call Trans.*, Ex. 43 at p. 1). While Mrs. Simpson was still on the line, at approximately 5:12 am, Damer dispatched the police and provided information about the situation, including the fact that her husband, Jory Simpson, had Strickland secured on the ground. (*Id.* at 1:37. *See also Call Trans.*, Ex. 43 at pp. 2-3). The second call lasted 2 minutes, 56 seconds. (*Second 911 Call*, Ex. 42). While Mrs. Simpson was still on the line, at approximately 5:13 am, Damer dispatched EMSA. (*Id.* at 00:38. *See also Call Trans.*, Ex. 43 at p. 4; *Incident Detail Report (16409 S. 84th E. Ave.)*, attached as Exhibit 44; *EMSA Recording from 05:13:06*, attached as Exhibit 45). There is no audio recording of her doing so, but BFD records indicate that they were dispatched to the Simpson home at 5:14 am. (*Fire Run Report (16409 S. 84th E. Ave.)*, attached as Exhibit 46).

12. Disputed. Bixby police officers did not begin providing first aid to Simpson until approximately nineteen (19) minutes after he was shot by Little, even though Officer Simpson spotted Simpson's vehicle where it had gone off the road when Simpson lost control of it due to his injuries approximately four (4) minutes after the shooting. (*Little Dash Cam 1*, attached as

Exhibit 47 at 05:40, 18:32 – 20:30). Plaintiff disputes that Bixby Police officers radioed a request for an ambulance "simultaneously" with providing aid to Simpson because there is no recording of the radio transmissions to confirm *when* the request was made.

13. Disputed. Damer requested that EMSA respond to the scene where Simpson was found at 5:32 am. (*Incident Report*, Exhibit 39; *EMSA Recording from 05:32:43*, attached as Exhibit 48). EMSA arrived on scene at 5:38 am. (*EMSA Records*, attached as Exhibit 49).

14. Disputed. EMSA needed an additional first responder to assist with treating the gunshot victim, Simpson, while in transit. (*EMSA Records*, Exhibit 49 at EMSA 000002). EMSA called Bixby to request that they send BFD to assist, but dispatch (Damer) did not answer the phone. (*EMSA Recording from 05:54:49*, attached as Exhibit 50; *EMSA Recording from 05:55:14*, attached as Exhibit 51; *EMSA Recording from 05:57:00*, attached as Exhibit 52; *EMSA Recording from 05:59:57*, attached as Exhibit 53). In addition, the paramedics on scene asked the officers on scene to have dispatch send BFD (additional paramedic) to assist; the officers testified that, more than once, they asked dispatch to send BFD to the scene. (*EMSA Records*, Exhibit 49; *Deposition of Blake Simpson*, taken 03/09/2020, attached as Exhibit 54, pp. 16:25 – 17:14, 109:13 – 115:6; *Deposition of Robert Zigmont*, taken 03/10/2020, attached as Exhibit 55, pp. 29:13 – 30:5, 74:2 – 76:16, 98:3 – 100:13). The officers requested fire and EMSA "pretty much simultaneous" with moving Simpson to the grassy area after he was extracted from the vehicle, which happened approximately nineteen (19) minutes after the shooting. (*Little Video 1*, Ex. 47 at 18:32 – 20:30; *Zigmont Depo*, Ex. 55, p. 98:7-12; *Zigmont Dash Cam Video 1*, attached as Exhibit 56, at 17:05). EMSA waited on scene for approximately 18 minutes after Simpson was loaded for help from BFD that they thought was on its way (but wasn't). (*EMSA Records*, Ex. 49; *Zigmont Dash Cam Video 2*, attached as Exhibit 57, at 03:15 (Simpson loaded into the ambulance); *Zigmont Dash Cam*

*Video 3*, attached as Exhibit 58 at 01:01 (ambulance pulls away).[4] The normal practice is to send fire when an ambulance is called. (*Shirley Depo.*, Ex. 4 at pp. 115:18-25, 125:9-19; *B. Simpson Depo.*, Ex. 54 at p. 124:5-25; *Zigmont Depo.*, Ex. 55, at p. 105:15-21, 126:5-20. *See also BPD Manual*, Ex. 33 at BPD 0233). Damer, however, did not dispatch fire. (*Shirley Depo.*, Ex. 4 at pp. 113:13 – 115:14). This resulted in a "lengthy" delay that could be "the difference between life and death." (*Id.* at pp. 119:22 – 120:6, 120:25 – 121:20).

15. Disputed. (*See* Response to Fact No. 14, *supra*). When Simpson coded, EMSA asked Corporal Zigmont to have one of the police officers go in the ambulance to assist with treating Simpson rather than continue waiting for BFD. (*Zigmont Depo.*, Ex. 55 at pp 126:21 – 128:2, 148:16-22, 190:18 – 196:16. *See also Zigmont Video 2*, Ex. 57 at 17:09 – 20:00; *Zigmont Video 3*, Ex. 58, 00:00 – 01:06).  BFD did not arrive until after the ambulance had left because Damer did not call them until "the last second;" BFD was waiting at the other scene (the Simpson home), only about a mile away. (*Shirley Depo.*, Ex. 4 at pp. 113:6 – 116:6; *Zigmont Depo.*, Ex. 55 at 115:3-7, 201:6 – 206:10; *Zigmont Video 3*, Ex. 58 at 07:22 – 11:20; *Fire Run Report (17478 S. 92nd Ave. E.)*, attached as Exhibit 59 (showing BFD was not dispatched until 5:58 am). EMSA described the situation as a "clusterfuck" and said, "I don't know who it is down there [at Bixby] but she's an absolute idiot… she needs to get re-trained… that was ridiculous." (*EMSA Call at 061826*, attached as Exhibit 60).

16. Disputed. (*See* Response to Fact Nos. 14-15, *supra*).

17. Admitted, in part. Disputed, in part. Plaintiff does not dispute that EMSA is separate from the City. However, this fact is immaterial because the City dispatches EMSA as well as police and fire. (*Shirley Depo.*, Ex. 4 at p. 110:1-20).  City dispatch coordinates with EMSA to get people

---

[4] Each video is twenty (20) minutes.

the medical help they need. (*Id.* at p. 109:1-7).

### III.   PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT[5]

1.   Shirley is in control of and is the ultimate decision-maker regarding, hiring, training, and disciplining police officers and setting policy for BPD. (*See, e.g., Shirley Depo.*, Ex. 4 at pp. 5:16-20, 25:22 – 26:6, 41:1 – 42:17, 77:7 – 78:7). He is also in control of dispatch. (*Id.* at p. 106:20-22).

2.   A police officer is responsible for every shot he fires. (*Shirley Depo.*, Ex. 4 at pp. 68:21 – 69:6). "[I]t's a very serious situation when a life is taken." (*Id.* at p. 30:17).

3.   It is foreseeable that the dispatcher will need to get emergency medical services to critical patients. (*Shirley Depo.*, Ex. 4 at pp. 111:18 – 112:1).

4.   Damer had never worked as a dispatcher before Bixby hired her. (*Damer Application* attached as Exhibit 60).

5.   Shortly after the shooting, Damer was disciplined for failing to respond to calls and radio communications "numerous times" over "the last couple months." (*Discipline Report*, dated 09/25/2018, attached as Exhibit 61)

6.   Shirley knows that the ambulance delayed departing for the hospital with Simpson because they were waiting on assistance from BFD, which the dispatcher, Damer, should have sent but did not. Shirley has taken no action to learn *why* Damer did not send BFD (in accordance with the City's practice and as requested numerous times) to make sure this doesn't happen again. (*Shirley Depo.*, Ex. 4 at pp. 123:16 – 127:13).

7.   Simpson was bleeding out and dying at the scene. He had a serious, urgent need for

---

[5] These will be cited as "AMF" followed by the paragraph number.

medical treatment due to Little shooting him. (*Incident Report*, Ex. 39 ("Priority 1-Life Threatening Emergency")).

8.   Little did not tell dispatch that he was in pursuit, where he was, that he was exiting his patrol car, or that he was going to attempt what Little calls a "felony stop." (*Little Video 1*, Ex. 47, 00:57 – 01:14). Little did not call for back up. (*Id.*) After shooting Simpson, Little announced "shots fired" on the radio but did not say *who* had fired the shots. (*Id.* at 01:33). Little ignored a request to provide his location. (*Id.* at 01:53). Then, a few minutes later when he finally provided his location, it was not correct. (*Id.* at 02:45 – 03:30 (Little said he was on 93rd but he was on 92nd)).

9.   Due to Little's lack of communication, other officers were delayed from assisting in the search for the mortally wounded Simpson because they only had a general idea of where Little was and where they needed to begin their search. (*B. Simpson Depo.*, Ex. 54 at pp. 117:24 – 119:15; *Zigmont Depo.*, Ex. 55 at pp. 85:9 – 88:22, 90:14-23).

10. Little caused a delay in medical treatment for Simpson by ignoring the clear signs of where the vehicle went after he shot him; Little *twice* drove past the tire marks left by Simpson's vehicle as it went off the road. Skid marks, from where Simpson lost control of the vehicle after being shot, are seen swerving across and exiting the road as Little approaches the corner of East 176th Street and South 92nd East Avenue. (*Little Dash Cam 1*, Ex. 13 at 02:20 – 2:25; *OSBI Photographs of Crash Scene*, attached as Exhibit 63, at OSBI 001462). The tire marks left by the SUV as it departed the roadway are seen as Little passes by them at 02:26 and again at 04:41. (*Little Dash Cam 1*, Ex. 13 at 02:26 and 04:41; *Scene Photos*, Ex. 38 at OSBI 001354 – 1356, 1361 – 1362, 1461, 1463). Other Bixby police officers easily spotted the tire marks and Logan Simpson's SUV promptly after arriving in the neighborhood (*B. Simpson*, Ex. 54, pp. 12:25 – 13:7,

56:21 – 61:12, 119:11-15).

11. Before he killed Simpson, Little was criticized for not knowing where he was and not communicating his location to dispatch. (*Report*, Ex. 36. *See also Training Reports*, attached as Exhibit 64.

12. It is foreseeable that an officer's failure to communicate accurate location information could delay needed medical assistance. (*See, e.g., Report*, Ex. 36 (noting that Little's failure to provide accurate information regarding his location kept other officers from "assisting in a timely manner").

13. BPD policy states that "as practical, an officer shall provide appropriate medical care consistent with his or her training to any individual who has visible injuries… This may include providing first aid, requesting emergency medical services, and/or arranging for transportation to an emergency medical facility." (*BPD Manual*, Ex. 33 at BPD 0064 – 65).

14. BPD policy states that "***Firearms shall not be discharged at a moving vehicle*** unless… A person in the vehicle is threatening the officer or another person with deadly force by means other than the vehicle; or The vehicle is operated in a manner deliberately intended to strike an officer or another person, ***and*** all other reasonable means of defense have been exhausted (or are not present or practical), *which includes moving out of the path of the vehicle*. (*BPD Manual*, Ex. 33 at BPD 0068 – 69) (emphasis added).

15. BPD policy states: "Employees shall respond to, or dispatch without delay all calls for Police service from citizens or other Police Officers. ***Emergency calls take precedence***; however, all calls shall be answered as soon as possible and consistent with normal safety precautions and traffic laws." (*BPD Manual*, Ex. 33 at BPD 0123) (emphasis added).

16. BPD policy states that officers should communicate with dispatch to acknowledge

receipt of a radio transmission, when getting out or and returning to their vehicle, when making a traffic stop, needs information and/or assistance and throughout a pursuit. (*BPD Manual*, Ex. 33 at BPD 0184 – 185, 233).

17. BPD policy sets forth procedures for dispatching police, fire, and ambulance. (*BPD Manual*, Ex. 33 at BPD 0230 – 231, 233).

18. The BPD Manual sets forth policies and procedures for, among other things, traffic stops, pursuits, and the use of force. (*See BPD Manual,* Ex. 33 at BPD 0064 – 70, 92 – 93, 149, 184 – 187).

## IV.   ARGUMENT AND AUTHORITIES

### A.   STANDARD OF REVIEW

A motion for summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts that the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way and is 'material' when it is essential to the proper disposition of the claim." *Haynes v. Level 3 Comm's LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citations omitted), *cert. denied*, 127 S. Ct. 1372 (2007). In deciding a motion for summary judgment, a court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant carries this initial burden, the non-movant must then set forth specific facts demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). However, the non-moving party's burden is not onerous. *Alder v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1988). Even as recently as 2014, the Supreme Court unanimously vacated a summary judgment

dismissal in a Fourth Amendment shooting case and remanded for failure to construe all facts in the light most favorable to the Plaintiff. *See Tolan v. Cotton*, 572 U.S. 650 (2014).

### B.   THE UNDERLYING CONSTITUTIONAL VIOLATIONS

#### 1.   The Shooting

Bixby and Shirley argue that they cannot be held liable because Little killed Simpson but did not violate Simpson's Constitutional rights. Defendants sole support for this proposition is Little's self-serving Motion for Summary Judgment. For the reasons provided by Plaintiff in opposition to that motion, this argument is without merit. Little used deadly force against a fleeing suspect when there was no immediate risk of death or serious bodily injury to Little or anyone else. There is no physical evidence that to support Little's version of events.

It has been the law of the land since at least 1985 that a police officer may not use deadly force—fire a weapon—at a suspect simply because he refuses to halt. *Tennessee v. Garner*, 471 U.S. 1, 9 (1985) ("[N]otwithstanding probable cause to seize a suspect, an officer may not always do so by killing him."). As the United States Supreme Court explained:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

*Id.* at 11 (emphasis added). It is well-established that the Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during an arrest or investigatory stop. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001) ("[T]here is no doubt that *Graham v. Con*nor ... clearly establishes the general proposition that use of force is contrary to the Fourth

Amendment if it is excessive under objective standards of reasonableness'") (quoting *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001)).

Little's claim that he believed he was in danger is of no consequence. *See Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional") (*citing Scott v. United States*, 436 U.S. 128, 138 (1978)). An objectively reasonable officer on the scene would have known that Simpson did not present an imminent risk of physical harm to Little (or anyone else). Moreover, the Tenth Circuit has noted that evidence that the shots were fired into the side of the vehicle – not while the vehicle was "bearing down" on the officer –supported a finding that the officer was not in imminent danger and, therefore, could not, constitutionally, use deadly force. *Cordova v. Aragon*, 569 F.3d 1183, 1191 (10th Cir. 2009); *Reavis v. Frost*, 967 F.3d 978 (10th Cir. 2020). Not only did Little violate Simpson's rights when he fired into the side and rear of Simpson's vehicle, Little was on notice that he was not authorized to use force against a suspect who posed no imminent threat of physical harm to himself or others. As such, there is an underlying constitutional violation which can support liability on the part of Defendants.

## 2.   Delaying Medical Care

In addition to the constitutional violation by Little for killing Simpson, Plaintiff alleged constitutional violations by the City and the Doe Defendants (since identified as Damer and Damme) for depriving Simpson of prompt medical treatment for the injuries inflicted upon him by Little. Doc. 26 at 17-19. "A person who is injured while being apprehended by the police has a due process right to have the responsible state actor provide medical aid." *Burke v. Glanz*, 292 F. Supp. 3d 1235, 1246 (N.D. Okla. 2017) (*citing City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983)). An officer can satisfy that obligation by promptly summoning

emergency help. *Id.* "The law is clearly established that arresting officers violate the constitutional rights of detainees when they are deliberately indifferent to a detainee's serious medical needs, and that even a short delay in obtaining medical care where the officer knows of and disregards an excessive risk to the detainee's health or safety may be found unconstitutional." *Id.* at 1247 (*citing Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315–17 (10th Cir. 2002); *Estate of Booker v. Gomez*, 745 F.3d 408, 433–434 (10th Cir. 2014); *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).

Simpson had a serious, urgent medical need for medical treatment due to the gunshot wounds inflicted upon him by Little. (AMF #7). Little delayed medical treatment for Simpson by ignoring the clear signs of where the vehicle went after Little shot him. (AMF #10). Further, when asked for his location, Little did not respond. (AMF #8). When he finally did, he provided inaccurate information. (*Id.*). This delayed other officers from finding Simpson. (AMF #9). Several times before he killed Simpson, Little was criticized for not communicating and not knowing where he was. (RUF # 5; AMF #11).

The City further delayed medical treatment for Simpson because, after realizing the seriousness of the injuries, EMSA asked for assistance from BPD. (RUF 11-16). Damer deliberately and purposefully ignored the calls from EMSA and requests by the officers on scene to send fire to assist with providing medical care to Simpson in transit to the hospital. (*Id.*). She never said she was not going to do it; she just did not do it. (*Id.*). As a result, EMSA sat at the scene, waiting for assistance that they thought was on its way but was not. (*Id.*). The failures of Little and Damer, which were the result of the defective hiring process (discussed further below) and lack of training by the City, caused Simpson's transport to the hospital to be delayed by over 20 minutes. (*Id.*; AMF #10). Shirley admits minutes matter. (RUF # 14). By letting Simpson bleed out, the City eliminated the only witness who could contradict Little's version of the shooting

18

events. The law is clear that delaying aid to a gunshot victim is a violation of constitutional rights. The Tenth Circuit held that "a medical need is sufficiently serious if it is one ... that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" *Booker*, 745 F.3d at 430 *quoting Mata*, 427 F.2d at 751. Two gunshot wounds from point-blank range to the midsection would certainly fall within this category. *See, e.g. Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015) (noting that "a gunshot wound presents an objectively serious medical need"). There is an underlying constitutional violation for delaying medical care to Simpson that supports liability on the part of Defendants.

## C.   PLAINTIFF'S § 1983 HIRING CLAIM

As the Supreme Court recognized, the risk from "inadequate screening of an applicant's background . . . depends on the background of the applicant." *Board of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 410 (1997). "A lack of scrutiny may increase the likelihood that an unfit officer will be hired, and that the unfit officer will, when placed in a particular position to affect the rights of citizens, act improperly." *Id.* Thus, "where adequate scrutiny of an applicant's background would lead a *reasonable policymaker* to conclude that the *plainly obvious consequence* of the decision to hire the applicant would be the deprivation of a third party's federally protected right . . . the official's failure to adequately scrutinize the applicant's background [can] constitute 'deliberate indifference.'" *Id.* at 411 (emphasis added).

Shirley is the final decision-maker for Bixby on hiring police officers. (AMF #1). Shirley testified that he would not hire someone who had used illegal drugs. (RUF # 3). Bixby had in its possession admissions from Little that he had used illegal drugs. (*Id.*). Shirley claims he had no knowledge of that. (*Id.*). Shirley testified that the fact that a candidate had been suspended from school would be important to know. (*Id.*). Bixby had evidence that Little had been suspended for

both. (*Id.*). Again, Shirley claims to have no knowledge of this fact. (*Id.*). Such facts are particularly important here because they are an indication of Little's tendency to use force when angry or threatened.

Shirley testified that lying on an application would disqualify a candidate. (RUF # 3). Little lied about several times on his application, like stating he was "laid off" – not fired – by WCSO. (*Id.*). Shirley testified that the fact an officer had been fired from one law enforcement job may mean he is unfit for rehire by another. (*Id.*). That certainly seems to have been the conclusion that a dozen other departments came to because Bixby is the only department that offered Little a job. (*Id.*). Even his hometown, Owasso, rejected him.  (*Id.*).

Shirley claims he did not know that Little had been fired. (RUF # 3). This strains credibility. WCSO told Bixby they would share the file if they were provided a release. (*Id.*). Bixby had a release signed by Little that would have enabled them to obtain the file. (*Id.*). Bixby certainly knew how to use the release provided by Little to obtain records from his former employer because they used it to obtain the file from TCSO. (*Id.*). Had Bixby/Shirley used the release provided by Little to obtain WCSO's file, they would have *known* that Little lied on his application and they would have learned of numerous incidents at WCSO that raise concerns about Little's professionalism. (*Id.*). It is as if Bixby/Shirley knew (or had been told) that information in the WCSO filed would be unfavorable so they deliberately chose *not* to get it.

The fact of the matter is Little did meet Bixby's standards. Add to that, a psychological evaluation that should *also* have raised concerns about Little's fitness for duty -- an officer who will not accept responsibility is an officer who will not listen and learn. Despite all that, Defendants hired Little and now assert they followed their "hiring process" for Little. Doc. 70 at 11. From this, it can reasonably be inferred that Defendants have a policy or custom of hiring persons who, by

their own standards, are unqualified.

This is not a case where the plaintiff alleges the defendants performed a "less than careful scrutiny of an applicant." *See, e.g. Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998). Unlike the hypothetical situation in *Brown*, 520 U.S. at 410-11, we are not dealing with an applicant whose background reveals no cause for concern. There were *definite* causes for concern in Little's background. Moreover, unlike *Brown*, 520 U.S. at 408–09, we are not dealing with a single case where the municipality did not subject an applicant to sufficient scrutiny and hired someone that, it turned out, was a poor choice. Rather, we are dealing with a situation where the municipality *knew* the applicant – by its own standards – was not fit but *hired him anyways*. If "[a] lack of scrutiny may increase the likelihood that an unfit officer will be hired, and that the unfit officer will, when placed in a particular position to affect the rights of citizens, act improperly," *Brown*, 520 U.S. at 408–09, then hiring an officer that the municipality *knows* is unfit makes it virtually certain that the unfit officer, when placed in a position to affect the rights of citizens, will act improperly. Little had a demonstrated history of acting improperly before he was hired by Bixby and he continued it afterwards. These facts, when viewed in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor shows there are genuine issues of fact regarding whether Bixby and Shirley acted with deliberate indifference in their hiring practices and/or in their hiring of Little. *See, e.g.*, *J.L.C. v. McKinney*, 2014 WL 4145550, at *3 (W.D. Okla. Aug. 19, 2014) (holding that plaintiff stated claim for deliberate indifference when the sheriff hired officer with known history of assault and that another department to refuse to hire); *Raby v. Baptist Med. Ctr.*, 21 F. Supp. 2d 1341, 1354 (M.D. Ala. 1998) (holding that plaintiff stated claim for deliberate indifference when supervisor hired officer without performing a background check and officer had previously been terminated by another police department).

Defendants also claim that their hiring decision is too removed from the shooting to be relevant. Doc. 70 at 21. However, Little continued to engage in the same behaviors at Bixby that had gotten him reprimanded from his prior job, which fired him. (Exhibits 18-25, 32, 34, 36-27). The fact Little had not shot someone before Simpson is simply fortuitous. Little shot Simpson after a brief pursuit, when it became apparent that Simpson was going to get by Little. (Doc. 96). There are two prior documented instances of Little engaging in pursuits that created danger for himself, the suspect, and the public, demonstrating that Little's mindset was to do "whatever it takes" to apprehend a fleeing suspect. (RUF # 5). There is no evidence that Defendants attempted to correct Little or provide remedial training showing that sometimes, like it says in the Manual, it is better to let the suspect escape and apprehend them somewhere else, later.[6] (AMF #8). Moreover, before he killed Simpson, Little pulled his gun and threatened to use deadly force against another minor who was refusing to exit a vehicle. There was no evidence or claim that the minor was armed or posed a threat to Little or anyone else (the minor was in the passenger seat so he could not have been accused, as Little accuses Simpson, of using the vehicle as a weapon). (RUF #4-5). There are also two documented instances of Little using non-deadly force to apprehend a suspect. (*Id.*). These facts, particularly in light of his history of fighting and unfitness, and when viewed in the light most favorable to Plaintiff show that there is a genuine issue of material fact regarding whether Bixby and Shirley were deliberately indifferent to the likely risk that Little would use excessive (even deadly) force to apprehend a suspect when they made the decision to hire him. The Motion should be denied.

---

[6] That certainly would have been feasible on July 22, 2018 because it was early in the morning and there was no other traffic, which would have made spotting the vehicle again much easier. Plus, since it was Simpson driving it – not a thief – it would have ended up back at the Simpson home where it would have been seen by the other officers, who had arrived there to respond to the 9-1-1 assault call.

### D.   PLAINTIFF'S § 1983 FAILURE TO TRAIN CLAMS

The actions of Shirley—Chief of Police and final policymaker for the City of Bixby—impute liability to the City under Section 1983. There are genuine issues of material fact about whether the City failed to train and supervise its patrol and communications officers and thus created and controlled the constitutionally infirm environment at BPD. When viewed in the light most favorable to Plaintiff it is apparent that there is evidence from which a reasonable jury could conclude that the City was deliberately indifferent to the risk of constitutional harm to citizens from untrained deputies using deadly force and untrained communications officers coordinating the emergency medical response. The motion should be denied.

### 1.   <u>Use of Deadly Force</u>

The Supreme Court recognized that failure to train can give rise to § 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). As explained by the Tenth Circuit:

> In order to prevail on a claim against a municipality for failure to train its police officers in the use of force, a plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:
> (1) the officers exceeded constitutional limitations on the use of force;
> (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal;
> (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and
> (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000) (internal citations omitted).

Defendants argue that Plaintiff cannot show Bixby police officers were inadequately trained because the officers must be C.L.E.E.T. certified. (Doc. 70 at 27). However, C.L.E.E.T. sets the bare *minimum* qualifications for police officers in Oklahoma. 70 O.S. § 3311(B)(2)

(authorizing C.L.E.E.T. to "[p]romulgate rules with respect to such matters as certification, revocation, suspension, withdrawal and reinstatement of certification, *minimum* courses of study, testing and test scores, attendance requirements, equipment and facilities, *minimum* qualifications for instructors, *minimum* standards for basic and advanced in-service courses, and seminars for Oklahoma police and peace officers") (emphasis added). Simply because an officer is C.L.E.E.T. certified does not mean that, as a matter of law, he was properly trained. As the Supreme Court explained:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for *more or different training* is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide *proper training* may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.
> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.

*City of Canton*, 489 U.S. at 390 (emphasis added). The unpublished Eastern District of Oklahoma cases cited by Defendants do not contradict this axiom. Indeed, in both cases there was undisputed evidence the police officers received training by their supervisor and/or department, *in addition to* the minimal training provided or required by C.L.E.E.T. *Jones v. Hacker*, No. 13-CV-00444-JHP, 2015 WL 1279363, at *1 (Mar. 20, 2015) (noting that the officers were C.L.E.E.T. certified but also received "on-the-job 'in house' training regarding their duties as police officers" and the department's policies and procedures manual); *Rollins v. Town of Haskell, Okla.*, No. CIV 08-309-JHP, 2009 WL 3614784, at *10 (Oct. 28, 2009) (noting that the officer had received field training and direction from the police chief and also had access to all departmental policies in addition to complying with 70 O.S. § 3311).

Defendants did not provide and did not require police officers to undergo shoot-don't shoot training. (RUF #1). Such training is necessary to keep officers' skills fresh. (*Id.*). Shirley admits that shooting is a perishable skill and that such training would be helpful to officers in making the correct decision about whether and how much force to use. (*Id.*). The highly predictable and patently obvious of not having regular shoot don't shoot training is an officer using deadly force when not constitutionally authorized to do so. That is exactly what happened here.

Even "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, [can] trigger municipal liability. *Brown*, 520 U.S. at 409 *citing Canton*, 489 U.S. at 309 ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious ... that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"). The Tenth Circuit upheld a denial of summary judgment where the municipality had not provided or required "shoot-don't shoot" training since its officers went to academy. *Zuchel v. City & Cty. of Denver, Colo.*, 997 F.2d 730, 740–41 (10th Cir. 1993) (citing with approval the expert's opinion that "It's predictable in big cities that police officers will run into situations where they're going to have to make judgments as to whether or not to shoot. And if they're not periodically trained and instructed on how to do that appropriately, they'll make mistakes"). Plaintiff's expert offers a similar opinion here that shoot/don't shoot training is necessary to ensure that officers make the *correct* decision about the use of force in each situation. (RUF #1). Even Shirley agrees. (*Id.*).

Next, as previously discussed, Little did exceed the constitutional limitations on the use of force. *See* Section IV(B)(1), *supra*.

The second prong is also easily satisfied. Defendants do not claim that traffic stops,

pursuits, and use of force are not usual and recurring situations with which police officers must deal. Doc. 70 at 28. Rather, Defendants claim that Simpson converted a usual situation to a "rare and highly unusual situation when he aimed his vehicle at Officer Little and attempted to run him over." *Id.* There are two problems with this assertion. First, whether Simpson was attempting to run Little over or drive around him is a hotly contested question of fact. There is no physical evidence that supports Little's version of the facts. Second, judging simply by the number of *appellate* opinions dealing with the question of whether a suspect was attempting to run an officer over, it is not that unusual. *See, e.g., Reavis v. Frost*, 967 F.3d 978, 995 (10th Cir. 2020) (deputy not entitled to qualified immunity where he claimed suspect tried to run him over but shots were in the side and rear of the vehicle): *McGrath v. Tavares*, 757 F.3d 20 (1st Cir. 2014)(officer fired into front windshield when suspect drove towards him following high speed chase and crash); *Krein v. Price*, 596 F. App'x 184, 188 (4th Cir. 2014) (finding that fact question about whether officer, who claiming suspect drove vehicle at him, was in danger when he fired into the side of the vehicle precluded summary judgment on the issue of qualified immunity); *Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009)(it was not reasonable for officer to fire at the back of a fleeing vehicle); *Godawa v. Byrd*, 798 F.3d 457 (6th Cir. 2015)(officer not entitled to summary judgment on qualified immunity when he fired at suspect fleeing in vehicle from the side – not the front).

The third prong is satisfied because Shirley testified that taking a life was serious and that shoot/don't shoot training would be helpful for officers to know when they should or should not use deadly force but he did not provide or require officers in the department to undergo such training. (RUF #1). Shirley oversaw a culture and overarching set of practices that refused to critique officers who made mistakes, not even when they endangered lives and constitutional rights. (*See, e.g.* RUF #5; AMF #5-6). Little's whatever-means-necessary approach to

apprehending suspects was ratified by Shirley when he took no serious action to discipline Little and certainly did not require him to undergo any additional training. (RUF #5). Similarly, Shirley took no action when Little drew his weapon and aimed it at a minor passenger who was refusing to leave the vehicle even though there was no indication the minor was armed or posed any danger to Little or anyone else. (*Id.*). Simply put, this officer was highly likely to inflict this type of constitutional injury. It was just a matter of when.

The fact that the City knew of this prior event but never disciplined Little or required him to undergo any training about when deadly force is appropriate *catalyzed* the likelihood that—if Little was not retrained—he might shoot someone. *See Brown,* 520 U.S. at 407–08 ("[T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training ... is the 'moving force' behind the plaintiff's injury"). *See also Otey v. Marshall,* 121 F.3d 1150, 1155 (8th Cir.1997) (a supervisor can be held liable "if his failure to train or supervise the offending actor caused the deprivation"). In those cases, we may find that a supervisor has somehow caused the violation to occur by an egregious failure to act. See, e.g., *Canton*, 489 U.S. at 390 n. 10, (hypothetically, equipping officers with firearms but neglecting to train them on their appropriate use could result in liability).

"[A] showing of specific incidents which establish a pattern of constitutional violations is not necessary to put the City on notice that its training program is inadequate." *Allen v. Muskogee,* 119 F.3d 837, 842 (10th Cir. 1997). In a failure to train case where, as here, the policy itself is not unconstitutional, a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy. *See Allen v. Muskogee,* 119 F.3d at 844–45 (citing cases); *Brown v. Gray,* 227 F.3d 1278, 1286 (10th Cir. 2000). Bixby's written policies mean nothing if officers are not held accountable or properly

trained in that policy and the policy is not explained and applied in accordance with the constitutional limits on police use of force. The shooting review board convened by Shirley only considered whether Little could articulate a reason for killing Simpson and never questioned the accuracy of Little's version of events. (Ex. 32). The fact that simply being able to articulate any reason – even one that is not consistent with the physical evidence or that does not conform to the constitutional limitations on the use of force – for shooting someone means an officer can escape discipline shows deliberate indifference to the rights of its citizens.

## 2.       Delay of Medical Care

As the Supreme Court explained:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under s 1983.

*Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (internal citations omitted). Deliberate indifference involves both an objective and a subjective component. *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000); *Farmer v. Brennan,* 511 U.S. 825, (1994). The objective component is met if the deprivation is "sufficiently serious." *Farmer,* 511 U.S. at 834. A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980)). As noted above, there is no question that Simson had a serious, urgent medical for medical treatment due to for the gunshot wounds Little inflicted upon him (CITE) and the need for prompt medical treatment is one that even a lay person would easily

recognize.

"The second, subjective portion of the *Farmer* test requires that the prison official show "deliberate indifference" to the existence of any risk inherent in exposure to the challenged conditions." *DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001).  Little knew he had shot Simpson, yet he ignored requests to provide his location so other officers could assist with the search. Little also overlooked the obvious tire marks where the vehicle went off the road when Simpson lost control due to these injuries. (AMF #10). This resulted in a delay of approximately 4 minutes locating Simpson. (*Id.*). Damer knew medical treatment was needed for a gunshot victim. (RUF #11-16). She was requested at least three times (once by Officer Simpson, once by Corporal Zigmont, and once by EMSA) to send fire to the scene to assist with Simpson's medical care. (*Id.*) Per protocol, she should have already done that any way. (*Id.*; AMF # 13, 15, 17). If not, she should have done it when it was requested the first time, which according to the testimony of Officer Simpson, was while Simpson was still in the grassy area—before he was loaded into the ambulance. (*Id.*) Instead, Damer chose not to follow protocol and send fire ***and*** she deliberately ignored the requests for assistance and did not dispatch fire until approximately 20 minutes after it was first requested. (*Id.*). "[D]elays even of only a 'few minutes' in seeking care for life-threatening injuries can constitute deliberate indifference." *Valderrama*, 780 F.3d at 1122. Here, the combined indifference of Little and Damer resulted in an approximately twenty-four (24) minute delay in the critically injured gunshot victim, Simpson, being transported to the hospital. (RUF #14).

It is foreseeable that an officer's delay in providing his location or not providing an accurate location to dispatch can cause a delay in assistance arriving on scene. (AMF #12). Little was criticized for not keeping dispatch apprised of his location and for not knowing his geography well

enough (AMF #11) but, the City did not require him to undergo any additional training. Similarly, it is foreseeable that dispatch will have to coordinate responses between multiple departments, such as police, fire, and EMSA. (AMF #17). Shirley claims that Damer was provided training on how to do this. Yet, from her handling of the situation on July 22, 2018, it was obvious to everyone (except, apparently, Shirley) that she was unprepared and needed to be (re-)trained. (RUF #15). The expected result of failing to provide the training described here is that medical care, which could be the difference in life and death, is delayed. By ignoring the glaring failures in the system, Shirley demonstrates Defendant's indifference to the consequences of his actions and Simpson died. Summary judgment should be denied.

### E.   SHIRLEY IS NOT ENTITLED TO QUALIFIED IMMUNITY

To overcome a defendant's claim of qualified immunity, the plaintiff must allege facts showing that the defendant, either through his "personal participation" or "the promulgation of a policy," violated a "clearly established" Constitutional right. *Brown*, 662 at 1164. Shirley was personally involved in the decision to hire Little and the training (or lack thereof) provided to Little and Damer. He is the ultimate decision-maker for the City on such issues. As discussed in the preceding sections, there is a direct causal link between Shirley's actions (or inactions) and the death of Simpson in violation of his Fourth Amendment right to be free from excessive force, and his Eighth Amendment right to receive prompt medical care for the injuries Little inflicted upon him. Shirley acted with a culpable state of mind because he knew the risks of doing (or not doing) what he did. Yet, he did (or did not do) them anyways. Summary judgment should be denied.

### V.   <u>CONCLUSION</u>

Genuine issues of material fact preclude the entry of summary judgment in favor of Defendants. Plaintiff respectfully requests the Court enter an order denying Defendants' Motion.

Dated: October 2, 2020                    Respectfully Submitted,

                                          /s/ William B. Federman
                                          William B. Federman, Okla. Bar No. 2853
                                          Carin L. Marcussen, Okla. Bar No. 19869
                                          Federman & Sherwood
                                          10205 N. Pennsylvania Ave.
                                          Oklahoma City, OK 73120
                                          Telephone:  (405) 235-1560
                                          Facsimile:  (405) 239-2112
                                          wbf@federmanlaw.com
                                          clm@federmanlaw.com

                                          and

                                          Kevin D. Adams, Okla. Bar No. 18914
                                          Attorney at Law
                                          417 W. 7th St., Ste. 202
                                          Tulsa, OK 74119
                                          Telephone:  (918) 582-1313
                                          Facsimile:  (918) 512-4206
                                          kadams@lawyer.com

                                  **ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

        I hereby certify that on October 2, 2020, I electronically transmitted the foregoing to the
Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to
the following ECF registrants who are counsel of record in this case:

Scott B. Wood                             Thomas A. LeBlanc
Wood, Puhl &Wood, P.L.L.C.                Best & Sharp
2409 E. Skelly Dr., Ste. 200             One West Third St., Suite 900
Tulsa, OK 74105                           Tulsa, OK 74103

***Attorney for Defendant***              ***Attorneys for Defendants***
***Jon Little***                          ***City of Bixby, Oklahoma and Ike Shirley***

                                          /s/ William B. Federman
                                          William B. Federman