## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TIFFANY SIMPSON, Personal Representative of the Estate of Logan Wayne Simpson,<br><br>        Plaintiff,<br><br>v.<br><br>JON LITTLE, *et al.*,<br><br>        Defendants. | Case No. 18-cv-491-GKF-CDL |

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment [Doc. 70] of defendants City of Bixby (the City) and Chief of Police Ike Shirley (Chief Shirley).  For the reasons set forth below, the motion is granted.

## I.  Procedural History

On March 1, 2019, plaintiff Tiffany Simpson, as the personal representative of the Estate of Logan Wayne Simpson, filed a First Amended Complaint asserting four causes of action.  [Doc. 26].  Simpson's second cause of action is a 42 U.S.C. § 1983 excessive force claim against Bixby Chief of Police Ike Shirley, in his individual capacity, for failing to appropriately supervise, train, discipline, and conduct due diligence before hiring Jon Little (Officer Little) as a Bixby police officer.  The court previously dismissed plaintiff's failure to supervise, train, and discipline theories against Chief Shirley.  [Doc. 46].  Plaintiff's third cause of action is a § 1983 excessive force action against the City and Chief Shirley in his official capacity for failing to adequately screen Officer Little's background before hiring him, failing to train officers on how to conduct proper traffic stops and use appropriate force, and the failure to supervise and discipline officers.  The court dismissed the third cause of action against Chief Shirley in his official capacity and plaintiff's

failure to supervise and discipline theories against the City. [*Id.*].  Plaintiff's fourth cause of action is a § 1983 inadequate medical care claim against the City for failing to train dispatchers and officers with respect to how to report and respond to life-threatening emergencies.

The City and Chief Shirley now move for summary judgment on the remaining claims asserted against them: the inadequate hiring theory against the City and Chief Shirley in his individual capacity, and the failure to train theories against the City as to the use of excessive force and the provision of inadequate medical care.

## II.  Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (quoting *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002)).  "No genuine issue of material fact exists 'unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" *Hasan v. AIG Property Casualty Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (quoting *Bones v. Honeywell Int'l Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).

At this stage, the court "view[s] the facts in the light most favorable to [plaintiff] and resolve[s] all factual disputes and reasonable inferences in [her] favor." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1209 (10th Cir. 2019) (quoting *Knopf v. Williams*, 884 F.3d 939, 946 (10th Cir. 2018)).

## III.  Undisputed Material Facts

*A.  The Shooting[1]*

At approximately 5:09 a.m. on July 22, 2018 the Bixby Police Department received a 9-1-1 call from Tiffany Simpson.  Ms. Simpson asked the dispatcher, Leslie Aryn Damer, to send an ambulance and the police to her mobile home at 16409 South 84th East Avenue.  When asked why, she stated someone had attacked her son with an "axe or something."  Damer dispatched police officers at approximately 5:12 a.m., transferred the call to EMSA for dispatch of an ambulance at 5:13 a.m., and notified the Bixby Fire Department of the medical call to the Simpson residence at 5:14 a.m.

In the confusion, Ms. Simpson also mistakenly reported to Damer that "[s]omeone just stole my son's car.  Like, I don't know who all is here and what's going on."  Ms. Simpson stated "It's white.  It's a Toyota something." Actually, Ms. Simpson's sixteen-year-old son, Logan Simpson (Simpson), was driving the SUV.

Officer Little started toward the Simpson residence.  When Little was approximately one mile away, Simpson—driving the white Toyota SUV—passed Little going the opposite direction.  Suspecting the SUV to be stolen based on the radio call, Little turned around and began following Simpson.  Little turned on his lights, and, eventually, his siren to initiate a stop of Simpson but Simpson did not comply.

In a residential neighborhood, Simpson reached a dead-end.  Officer Little's dash camera video shows the SUV reach the end of the street, drive into a grassy yard, execute a three-point turn, and proceed back down the street in the opposite direction.  During that time, Little exited

---

[1]  The defendant's motion does not include a recitation of the facts leading up to and including the shooting, instead incorporating those facts from Officer Little's Motion for Summary Judgment. [Doc. 70, p. 9, n. 3].  Those undisputed facts are taken from the court's order on Officer Little's motion unless otherwise indicated.  [Doc. 124].

his patrol car, drew his gun from its holster, and began giving loud verbal commands for Simpson to "get on the ground" and "show me your hands."  Simpson continued eastbound.  Little fired ten (10) rounds at Simpson.

Two of the bullets, which entered through the driver's door of the SUV, struck Simpson in his left hip.  Little announced over the radio "210, shots fired, 210, shots fired."  Little's radio call sign was "210."  Four minutes later, two other Bixby police officers—Officers Blake Simpson and Aaron Godwin—located the SUV a couple of blocks away from where the shooting took place. [Doc. 99, p. 14, ¶ 12; *compare* Doc. 105 (Little Dash Cam 1 at 1:28 (shots fired)) *with id.* at 5:40 (officer reports "I've got him in the brush")].  Simpson had driven off the road, across a yard, and into a vacant field.

*B.  Medical Care*

Officers Little, Simpson, and Godwin found Logan Simpson unresponsive in his vehicle. The officers removed Simpson from the SUV, carried him to a clearing, and began administering first aid 19 minutes after the shooting.  The officers also radioed a request for fire and an ambulance.  In response, Damer contacted EMSA at 5:32 a.m.  EMSA dispatched one of their ambulances, which arrived on the scene at 5:38 a.m. Once the ambulance arrived, EMSA personnel took over Simpson's care and began administering medical treatment.  The EMSA personnel on the scene requested assistance, and Corporal Zigmont radioed dispatch for assistance from the Fire Department.

When Simpson began to code, the Bixby Fire Department had not yet arrived, so Officer Little entered the ambulance to assist with Simpson's treatment, and the ambulance departed for

the hospital.  In total, EMSA was on the scene for 27 minutes before leaving for the hospital.[2]

[Doc. 99-49, p. 2 (EMSA arrived on the scene at 5:38 a.m. and departed at 6:05 a.m.)].

C.  *Hiring of Officer Little*

The City of Bixby has the following hiring process for police officers:

- Open positions are publicly posted.

- Candidates undergo a testing process which includes a written test and a physical test, both of which are similar to CLEET testing.

- Candidates who pass the testing process submit to an oral board made up of various members of the Department and one citizen from the community.

- Candidates who attain a satisfactory score on the oral board then submit to an oral interview with the Chief of Police, and the Chief makes the decision whether to make a conditional offer of employment to any candidate.

- Any candidate who receives a conditional offer of employment is then referred to the Detective Division of the Bixby Police Department for a background check.

- If a candidate with a conditional offer of employment passes the background check, that candidate must then submit to a medical and psychological evaluation, including a MMPI test, which is conducted by a licensed psychologist experienced in such evaluations and testing.

- Only those candidates who have passed all phases of the testing, review, interview, background check and medical and psychological evaluation can then become employed as a probationary police officer with the City of Bixby.

- If a probationary officer has not obtained certification from the Oklahoma Council on Law Enforcement Education and Training (CLEET) prior to being hired, that officer will not work as a Bixby Police Officer until he/she graduates from the CLEET academy and obtains CLEET certification.

- All CLEET certified, probationary officers must successfully complete Bixby's Field Training Program to work as full-time, non-probationary officers.

[Doc. 70, pp. 10-11, ¶ 2; Doc. 99, p. 7, ¶ 2].

---

[2] In plaintiff's view, EMSA did not immediately leave the scene for the hospital because EMSA was waiting for an additional first responder from the Fire Department to administer CPR.  [Doc. 99, p. 15, ¶ 14; Doc. 99-49, p. 3].  The parties dispute when Damer dispatched the Fire Department to the scene. [*See* Doc. 70, p. 14, ¶¶ 15-16; Doc. 99, p. 15, ¶¶ 14-15].

The City hired Officer Little in 2013.  Little completed the application and written questionnaire, wherein Little stated he had been "laid off" from his previous law enforcement job with the Wagoner County Sheriff's Office (WCSO).  In truth, he had been terminated after "multiple reprimands, [and] violations of the Sheriff Office's rules and procedures." [Doc. 70, p. 11, ¶ 3; Doc. 99, pp. 7-8, ¶ 3; Doc. 99-6, p. 17; Doc. 99-8, p. 3, ¶ 6].  The City did not obtain the WCSO file on Little and thus did not learn of the following: Little's juvenile charge, reduced to speeding, of eluding a police officer; Little failing to report a motor vehicle accident; Little illegally hacking into a County computer; Little failing to turn found property (tools) into evidence; Little ignoring suggestions about tactics that he might use in different felony stop situations; and the WCSO receiving a citizen complaint about Little's conduct and attitude.  [Doc. 99, pp. 8-10, ¶ 3].  The hiring officer for the Bixby Police Department admits that, based on the WCSO employment records, "there's concern with [Little's] professionalism or his work."  [Doc. 99-10, p. 5].

Little passed the National Police Officer Selection Test and the City confirmed Little was CLEET certified.  [Doc. 70, p. 12, ¶ 3; Doc. 70-2, p. 3, ¶ 5; *see also* Doc. 70-2, pp. 2-3, ¶ 4].  Little submitted to and passed an oral review board, conducted by two Bixby Police Sergeants and one member of the community.  [Doc. 70, pp. 11-12, ¶ 3; Doc. 70-2, p. 3, ¶ 5].  Little was personally interviewed by Chief Shirley.  [*Id.*].  A credit check was performed, Little's fingerprints were sent to OSBI, a criminal check returned negative, a driver's license check reviewed few past infractions, Little's satisfactory high school and college transcripts were produced, and interviews were conducted with four personal references and Little's three most recent employers.  [*Id.*]. Little also underwent medical and psychological evaluations.  A licensed professional conducted a psychological exam and concluded Little "seems to be a reasonable, well adjusted person with many characteristics of a good officer and is suitable for employment as a peace officer." [*Id.*].

Prior to July 22, 2018, there were no reports that Little used deadly force in the line of duty, received any complaints against him regarding use of deadly force, or had been disciplined by the City or any other law enforcement agency regarding the use of deadly force.  [Doc. 70, p. 12, ¶ 4; Doc. 99, p. 11 ¶ 4].  However, Little had brandished his weapon and threatened to use deadly force against a minor.  [Doc. 99, p. 11, ¶ 4; Doc. 99-31, p. 5].  He had also used non-deadly force—a taser—twice.  [Doc. 99, p. 11, ¶ 4; Doc. 99-31, pp. 4, 7].

*D.  The City's Excessive Force Training*

Officer Little was CLEET certified prior to being hired by the City.  He maintained his CLEET certification and satisfied all training requirements of the State of Oklahoma throughout his employment with the City.  City police officers, including Little, are educated and trained to some degree regarding the use of firearms, the use of force and the use of deadly force.  [Doc. 70, p. 12, ¶ 6; Doc. 70-2, p. 4, ¶ 8].  However, officers are not required to take regular shoot, don't shoot scenario-based training.  [Doc. 99, p. 7, ¶ 1; Doc. 99-4, pp. 20-22, 28-29].

The City of Bixby has a policy regarding use of deadly force, which was in effect July 22, 2018, and provides:

> Use of Deadly Force
>
> An officer is authorized to use deadly force when it is objectively reasonable under the totality of the circumstances. Use of deadly force is justified when one or both of the following apply:
>
> 1. To protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.
>
> 2. To prevent the escape of a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit a felony involving serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to the officer or another if the subject is not immediately apprehended.

> Where feasible, the officer shall identify himself or herself as a law enforcement officer and warn of his or her intent to use deadly force.

[Doc. 70, pp. 12-13, ¶ 7; Doc. 99, p. 12, ¶ 7].

### E.  The City's Dispatcher Training

Damer was hired in March 2018 and completed Bixby's training program in May 2018. [Doc. 70, p. 13, ¶ 10; Doc. 70-2, p. 4, ¶ 11]. The education and training for a Bixby dispatcher includes 12 weeks of education, observation and hands-on training while under the supervision of an experienced Certified Training Officer. [Doc. 70, p. 13, ¶ 8; Doc. 99, p. 13, ¶¶ 8-9].

The City's dispatcher training includes all aspects of radio and telephone communications, dispatching police and fire department, and 9-1-1 communications with EMSA dispatchers, including coordination of all three agencies in emergency situations. Additionally, dispatchers are trained and certified by the State of Oklahoma regarding operations of the Oklahoma Law Enforcement Telecommunication System (OLETS). [Doc. 70, p. 13, ¶ 9; Doc. 99, p. 13, ¶¶ 8-9].

## IV.  Analysis

### A.  Underlying Constitutional Violation

The City and Chief Shirley argue that Simpson has failed to establish an underlying constitutional violation "[a]s shown in the Motion for Summary Judgment filed by Officer Little." [Doc. 70, p. 16].  That argument is unavailing for the reasons set forth in the court's order dated November 4, 2020. [Doc. 124].  A reasonable jury could conclude Officer Little's use of deadly force was unreasonable under the totality of the circumstances.

### B.  Simpson's Inadequate Hiring Claims against the City and Chief Shirley

As noted above, Simpson alleges Chief Shirley in his individual capacity and the City failed to adequately screen Officer Little's background before hiring him.

Failing to adequately screen job applicants can trigger § 1983 liability if the plaintiff meets the stringent "deliberate indifference" standard of fault. *Bd. of County Com'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 411 (1997). "The Supreme Court has made clear that the failure to conduct a sufficient background check on a job applicant is insufficient in itself to satisfy the deliberate indifference element." *Waller v. City and County of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (citing *Bryan Cty.*, 520 U.S. at 410-11). "The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation." *Bryan Cty.*, 520 U.S. at 410-11. "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id.* at 411.

### 1. The City

The City argues Simpson's inadequate hiring claim fails because "there is nothing [in] Little's background that would have led any policymaker for the City to conclude that the plainly obvious consequence of hiring Little would be the deprivation of a citizen's constitutional rights." [Doc. 70, p. 21].

Plaintiff responds that adequate scrutiny of Little's background would have revealed that Little was unqualified. In support, plaintiff points to evidence that Little admitted to prior use of illegal drugs, was suspended from high school, and was let go from his previous position with the WCSO after multiple reprimands and violations. [Doc. 99, pp. 24-25]. Further, plaintiff points to Little's WCSO file which reveals a prior charge of eluding a police officer and "numerous incidents at WCSO that raise concerns about Little's professionalism," including failing to report

a motor vehicle accident, hacking into a County computer, failing to turn found property (tools) into evidence, ignoring suggestions about tactics to use in different felony stop situations, and the WCSO receiving citizen complaints about Little's conduct and attitude.  [Doc. 99, p. 25; *see also* Doc. 99, pp. 8-10, ¶ 3].  And, "a psychological evaluation" should have "raised concerns about Little's fitness for duty—an officer who will not accept responsibility is an officer who will not listen and learn."  [Doc. 99, p. 25].

Adequate scrutiny of this evidence could lead a reasonable policymaker to conclude that "there's concern with [Little's] professionalism or his work."  [*See, e.g.*, Doc. 99-10, p. 5].  However, a reasonable policymaker could not conclude, based on this evidence, that the "plainly obvious consequence" of hiring Little would be the deprivation of Logan Simpson's right to be free from excessive deadly force.[3]  *See Bryan Cty.*, 520 U.S. at 413-14 (applicant's pleas of guilty to various traffic violations and assault and battery, resisting arrest, and public drunkenness arising out of college fight did not make use of excessive force plainly obvious consequence of decision to hire him as a police officer); *Barney v. Pulsipher*, 143 F.3d 1299, 1309 (10th Cir. 1998) (applicant's arrest for possession of alcohol and several speeding tickets would not have led policymaker to conclude applicant was highly likely to inflict sexual assault on inmates if hired as a correctional officer).

Plaintiff points to two cases in support of her argument that the City's hiring of Little constituted deliberate indifference.  But each of those cases is distinguishable.  First, in *J.L.C. v. McKinney*, the United States District Court for the Western District of Oklahoma concluded that where an applicant had a "known history of sexual misconduct," the policymaker "set into motion

---

[3] Simpson also points to events which occurred after the City hired Little.  [*See* Doc. 99, p. 27]. These events do not bear on whether Little's background at the time of hiring indicated whether he was highly likely to use excessive force.

the series of events that led to the alleged sexual assault of the Plaintiff."  Case No. CIV-11-683-C, 2014 WL 4145550, at *3 (W.D. Okla. Aug. 19, 2014).  In *Raby v. Baptist Medical Center*, the United States District Court for the Middle District of Alabama concluded the plaintiff had produced sufficient evidence of the policymaker's deliberate indifference to plaintiff's right to be free from excessive force where personnel files included "a complaint of [the applicant's] alleged excessive use of force" and the applicant's admission that he "had suspects who had resisted arrest and that one of the suspects who had resisted arrest had to go to the hospital." 21 F. Supp. 2d 1341, 1353-54 (M.D. Ala. 1998).  "Evidence of aggressiveness, especially in the context of a suspect who required hospitalization, is tied to the constitutional right at issue here."  *Id.* at 1354.  In both cases, the applicant's background revealed a tendency to engage in behavior similar to the conduct causing the alleged constitutional violation.  Here, in contrast, Officer Little's background does not reveal a tendency to be aggressive or to use excessive force.

Because a reasonable jury could not find that adequate scrutiny of Little's background would have led a reasonable policymaker to conclude that the plainly obvious consequence of hiring Little would be the deprivation of a third party's right to be free from excessive force, the City is entitled to summary judgment on Simpson's § 1983 inadequate hiring claim.

### 2. Chief Shirley

Chief Shirley argues he is entitled to qualified immunity on plaintiff's inadequate hiring claim.  Because Chief Shirley asserts a qualified immunity defense, "the [summary judgment] burden shifts to the plaintiff" to satisfy a "heavy two-part burden." *McCowan v. Morales*, 945 F.3d 1276, 1282 (10th Cir. 2019) (quoting *Estate of Ceballos*, 919 F.3d at 1212-13).  "The plaintiff must first establish that the defendant's actions violated a constitutional or statutory right.  If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct."  *Estate of*

*Ceballos*, 919 F.3d at 1212 (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).   "A court can consider the two qualified-immunity inquiries—whether the plaintiff has established a statutory or constitutional violation and whether that violation was clearly established—in any order."  *McCowan*, 945 F.3d at 1282 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

To establish that Chief Shirley violated a constitutional right in hiring Little, plaintiff must show that Chief Shirley acted with deliberate indifference.  *See Bryan Cty.*, 520 U.S. at 411; *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (There are "three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) *state of mind*." (emphasis added)).  But, as explained above, plaintiff points to no evidence which would allow a reasonable jury to find that adequate scrutiny of Little's background would have led a reasonable policymaker to conclude that the plainly obvious consequence of hiring Little would be the deprivation of another's Fourth Amendment rights.  Accordingly, plaintiff does not meet her burden to show Chief Shirley's actions violated a constitutional right.  *See Bryan Cty.*, 520 U.S. at 414 (Where the applicant's background "may well have made him an extremely poor candidate for reserve deputy," there was no deliberate indifference unless the applicant's "use of excessive force would have been a plainly obvious consequence of the hiring decision.").

Moreover, as to the clearly established prong of the qualified immunity test, "the Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'"  *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "[T]he salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional."  *Id.* (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650,

656 (2014)). "This requirement is satisfied where, at the time of the conduct in question, there existed 'a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . found the law to be as the plaintiff maintains.'" *Id.* at 1168-69 (quoting *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018)).

Plaintiff does not identify any Tenth Circuit or Supreme Court precedent which would provide fair warning to Chief Shirley that hiring an officer with a history of unprofessionalism, but not of excessive force, who later employs excessive force is unconstitutional. As a result, plaintiff does not meet her burden of showing a "clearly established" constitutional violation.

Because plaintiff does not satisfy either prong of her "heavy two-part burden," Chief Shirley is entitled to qualified immunity on plaintiff's § 1983 hiring claim.

*C. Simpson's Inadequate Training Claims against the City*

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality can be liable where 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Schneider*, 717 F.3d at 773 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). Simpson asserts § 1983 inadequate training claims against the City regarding both the use of force and the provision of medical care. The court considers each in turn.

**1. Excessive Force**

As the Tenth Circuit has explained:

> In order to prevail on a claim against a municipality for failure to train its police officers in the use of force, a plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:

(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation[] with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Estate of Ceballos*, 919 F.3d at 1221 (quoting *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003));

*see also Canton*, 489 U.S. at 388 ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."). The City argues that plaintiff fails to provide evidence on any of these requirements.

With respect to the first requirement, the City argues CLEET-certification vitiates any argument that its training is inadequate. Oklahoma law requires all police officers to be trained and licensed by CLEET. 70 Okla. Stat. § 3311. "During CLEET training, [Little] participated in shooting decisions training, which is also referred to as 'shoot, don't shoot' training. He also had training at the CLEET Academy on the use of force, including deadly force." [Doc. 70, p. 27]. Then, once hired as a probationary employee, Little completed 570 hours of police training over a 16-week period. "Little was educated and trained regarding the use of firearms, the use of force and the use of deadly force, including when and under what circumstances deadly force can be used according to federal law and Bixby's Use of Force Policies and Procedures." [*Id.*].

Plaintiff argues, however, that simply because an officer is CLEET certified does not mean that, as a matter of law, he or she was properly trained. Specifically, plaintiff points to evidence that the City does not require regular shoot, don't shoot training. "The highly predictable and patently obvious [consequence] of not having regular shoot don't shoot training is an officer using deadly force when not constitutionally authorized to do so." [Doc. 99, p. 30]. Plaintiff's expert opines that "[b]ecause the use of deadly force is the most serious of police field actions, it has been

14

long recognized as an industry practice that officers require consistent and updated use of force training" consisting of "[o]ngoing scenario training." [Doc. 99-1, p. 23].

While Little received shoot, don't shoot training prior to his employment with the City, the facts viewed in the light most favorable to plaintiff do not indicate Little received any updated scenario-based training as a Bixby police officer. Chief Shirley testified that the City has not provided shoot, don't shoot training in the past ten years. [Doc. 99-4, p. 20]. Further, Chief Shirley confirmed that the City of Bixby does not have a policy requiring all officers have practical simulation training, a policy that requires officers to complete use of deadly force simulation exercises, or a policy that requires officers to shoot at moving targets. [*Id.*, pp. 28-29].

The facts here are distinguishable from those in *Davis v. City of Tulsa, Oklahoma*, 380 F. Supp. 3d 1163 (N.D. Okla. 2019). There, the court concluded the evidence did not support plaintiff's contention that an officer did not receive scenario based training which included training as to when to use deadly force. "It is undisputed that the [Tulsa Police Department] Police Academy curriculum includes classroom instruction on 'Use of Force,' in the field training and *scenario based training on use of force up to and including deadly force*." *Id.* at 1177 (emphasis original). Further, the officer testified that he had "received several hours of classroom training and scenario based training in the use of force up to and including deadly force, and he received additional update 'Use of Force' training" weeks before the shooting at issue. *Id.* Here, in contrast, there is a dispute as to whether Officer Little received updated scenario based training on the use of excessive force after he was hired by the City in 2013. At this stage, all disputes must be resolved in favor of the plaintiff. *Estate of Ceballos*, 919 F.3d at 1209. Accordingly, for purposes of summary judgment only, the court must assume that Little had not received updated scenario based training. Further, Chief Shirley acknowledged that scenario based training can improve

officers' ability to make split-second decisions with deadly force, that the City would have offered it if they had enough funds, and that shooting is a perishable skill. [Doc 99-4, pp. 22-25]. A reasonable jury could therefore conclude, based on plaintiff's expert report and Chief Shirley's testimony, that, to the extent Little did not receive updated shoot, don't shoot training, he was inadequately trained.

However, plaintiff must also show that the City's training program, by not requiring regular shoot, don't shoot training, demonstrates deliberate indifference to the rights of citizens. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bryan Cnty.*, 520 U.S. at 410). "[A] lesser standard of fault would result in *de facto respondeat superior liability* on municipalities." *Canton*, 489 U.S. at 392. Due to this stringent standard of fault, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62. However, the Supreme Court has not foreclosed the possibility that, in rare circumstances, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Such rare circumstances in which deliberate indifference may be found absent a pattern of unconstitutional conduct exist when a municipality fails to train employees in "specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Barney,* 143 F.3d at 1308.

Here, plaintiff does not show a pattern of similar constitutional violations involving the excessive use of deadly force to support a finding of deliberate indifference. Instead, plaintiff points to a single incident wherein "Little drew his weapon and aimed it at a minor passenger who

was refusing to leave the vehicle even though there was no indication the minor was armed or posed any danger to Little or anyone else." [Doc. 99, p. 32]. But, this event did not involve the use of force.

Nor is this a situation in which deliberate indifference may be found absent a pattern of unconstitutional conduct. Plaintiff does not show that the unconstitutional consequences of failing to require updated shoot, don't shoot training are "so obvious" as to trigger § 1983 municipal liability. *See Carr*, 337 F.3d at 1229 ("[A] finding of deliberate indifference in this situation requires a showing that 'the need for more or difference training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'").

In plaintiff's view, the City had actual or constructive notice that it should require regular shoot, don't shoot training "because Shirley testified that taking a life was serious and that shoot/don't shoot training would be helpful for officers to know when they should or should not use deadly force but he did not provide or require officers in the department to undergo such training." [Doc. 99, p. 31]. "But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." *Connick*, 563 U.S. at 68.

Plaintiff also argues the Tenth Circuit's opinion in *Zuchel v. City and County of Denver, Colo.* 997 F.2d 730 (10th Cir. 1993), put the City on notice that it should require regular shoot, don't shoot training. However, that case is distinguishable. In *Zuchel*, the Denver Police Department received a letter from the Denver district attorney. The district attorney pointed out that six deadly force incidents involving citizens and police officers had occurred during the previous six-week-period, and recommended periodic shoot, don't shoot live training under street conditions. *Id.* at 740. The Tenth Circuit concluded "[t]his evidence is clearly sufficient to permit

17

the jury reasonably to infer that Denver's failure to implement [the district attorney's] recommendation on periodic live range training constituted deliberate indifference to the constitutional rights of Denver citizens." *Id.* at 741.  Here, however, there is no evidence that the City received any recommendation on implementing shoot, don't shoot training.  "That distinction is crucial due to the Supreme Court's mandate that, to prevail on a claim of insufficient training, plaintiffs must present evidence that 'city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights.'"  *Davis*, 380 F. Supp. 3d at 1176 (quoting *Connick*, 563 U.S. at 61-62).

Accordingly, *Zuchel* is distinguishable and plaintiff points to no facts from which a reasonable jury could infer that the City had notice that failing to require regular shoot, don't shoot training would result in Little's use of excessive force.  *See Carr*, 337 F.3d at 1229 (concluding plaintiff failed to establish deliberate indifference where plaintiff enumerated multiple ways in which he contended the officers were inadequately trained, but "fail[ed] to provide evidence of how the City had notice that its actions (or failures to act) were likely to result in constitutional violations").

Further, it is undisputed that the City has a written policy and procedure on the use of force, including deadly force.  *See Davis*, 380 F. Supp. 3d at 1177 (noting TPD's use of force policy in concluding the City of Tulsa was entitled to judgment as a matter of law on plaintiff's training claim).  The policy closely mirrors the legal principles set forth in the Supreme Court's Fourth Amendment precedent. [*See* Doc. 70, pp. 12-13, ¶ 7; Doc. 99, p. 12, ¶ 7].  Plaintiff does not dispute that this policy meets constitutional standards, but instead disputes "that Little followed the BPD use of force policy." [Doc. 99, p. 12, ¶ 7].  "When employees take actions specifically authorized by policy or custom, their actions can be fairly said to be the municipality's.  But when they act

inconsistently with official policy or custom, though perhaps even still within the scope of employment, that will not suffice." *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1284 (10th Cir. 2007).

Plaintiff presents no evidence from which a jury could find the City had actual or constructive notice that its failure to require regular shoot, don't shoot training would cause City policy officers to violate citizens' constitutional rights. As a result, the City is entitled to summary judgment on plaintiff's excessive force training claim.

### 2. Medical Care

Plaintiff asserts a § 1983 inadequate medical care claim against the City based on its alleged failure to train its police officers and dispatchers "with regard to information to be shared between first responders (police officers, firefighters, and paramedics) and dispatchers and between dispatchers and first responders." [Doc. 26, p. 18, ¶ 117]. Specifically, plaintiff argues that the City was deliberately indifferent in not requiring Little and Damer to undergo additional training. [Doc. 99, pp. 34-35]. To succeed on this theory, plaintiff must show that the City "was on notice that, absent additional specified training, it was 'highly predictable'" that Little and Damer would unconstitutionally delay the provision of medical care to citizens like Logan Simpson. *Connick*, 563 U.S at 71. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (citing *Bryan Cty.*, 520 U.S. at 409).

Plaintiff argues that, based on Damer's "handling of the situation on July 22, 2018, it was obvious to everyone . . . that she was unprepared and needed to be (re-)trained." [Doc. 99, p. 35]. However, Damer's actions on July 22, 2018 do not constitute notice to the City that she needed to be re-trained *prior* to July 22, 2018. Absent some evidence of actual or constructive notice to the City prior to the alleged underlying constitutional deprivation, plaintiff cannot show the City acted

with deliberate indifference in failing to provide additional training to Damer. *See Connick*, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

As to Little, plaintiff points to 2013 training reports which indicate Little needed improvement in his understanding of the City of Bixby's geography. [*See, e.g.*, Doc. 99-64]. However, those reports indicate that Little was making progress in this area and, in any event, the reports do not bear on Little's familiarity with the City's geography five years later. Plaintiff also points to a 2015 incident in which Little failed to "provide accurate information via radio as to his location during and after [a] pursuit thus [preventing] responding units from assisting in a timely manner." [Doc. 99-36, p. 1]. But, that incident did not involve the provision of medical care. Because that incident is not similar to the violation at issue here, it "could not have put [the City] on notice that specific training was necessary to avoid this constitutional violation." *Connick*, 563 U.S. at 63. Moreover, a single incident of Little misreporting his location three years prior to the conduct at issue here is insufficient to show "the need for more or additional training [was] *so obvious*, and the inadequacy *so likely* to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Carr*, 337 F.3d at 1229 (emphasis added).

Further, even if the City acted with deliberate indifference in not requiring Little to undergo additional training with respect to sharing his location, plaintiff does not show that there is a direct causal link between Little's lack of additional training and the alleged violation here. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (When alleging municipal liability, a plaintiff must show "1) the existence of a municipal policy or custom, and 2) that there is a direct

causal link between the policy or custom and the injury alleged.").  Plaintiff argues Little delayed medical treatment for Simpson by ignoring the clear signs of where the vehicle went after the shooting and delayed other officers from finding Simpson by reporting delayed, inaccurate information.  [Doc. 99, p. 23].   However, there is no dispute that other officers located Simpson four minutes after the shooting—despite Little's actions—and began administering first aid. Plaintiff does not argue the four minutes it took responding officers to locate Simpson constituted an unconstitutional delay in care.  She instead focuses on the twenty-minute delay in Simpson's transport to the hospital while EMSA awaited the Fire Department.  [*See id.*].  There is no evidence connecting Officer Little's actions to the later delay in transport.

> For these reasons, the City is also entitled to summary judgment on plaintiff's inadequate medical care claim.

## V.  Conclusion

> WHEREFORE, the Motion for Summary Judgment [Doc. 70] of defendants City of Bixby and Chief of Police Ike Shirley is granted.

> IT IS SO ORDERED this 13th day of November, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE